# AFFIDAVIT OF BORDER PATROL AGENT ARGELIA G. ROBLES

Your affiant, Argelia G. Blair, Border Patrol Agent of the United States Border Patrol, being duly sworn, does depose and state the following:

## INTRODUCTION AND AGENT BACKGROUND

1. I, Argelia G. Blair, am a Border Patrol Agent with the United States (U.S.) Department of Homeland Security, United States Border Patrol (USBP), and have been since April 2005. I completed the USBP Academy in September 2005. There I received instruction in constitutional, immigration, and criminal law as well as federal and civil statutes. I have also received instruction in the detection, interdiction, and arrest of narcotics smugglers, alien smugglers, and aliens illegally present in the United States.

2. I have been assigned as a case agent to the Tucson Sector Prosecution Unit for approximately ten years. I have conducted investigations involving illicit activity, and I have gathered and structured evidence and facts pertaining to administrative and criminal cases. I routinely perform record checks through various law enforcement databases to establish accuracy of information as well as to gather facts further relevant to a respective case. I have acted as a liaison between the United States Attorney's Office and field agents, and I have assisted fellow agents in the development of their cases. The statements contained in this affidavit are based on information provided by fellow Border Patrol Agents and on my experience as a Border Patrol Agent in the USBP. Since this affidavit is submitted for the limited purpose of securing a search warrant, I have not included all facts known to me regarding this investigation. I have set forth facts that establish probable cause to believe

that the suspect/defendant referred to in this investigation conspired with other known and unknown individuals, wherein they jointly facilitated, either verbally or electronically, the trafficking of undocumented non-citizens into and within the United States. This affidavit is intended to show only that there exists sufficient probable cause for the requested warrant and does not portray all my knowledge about this matter.

3. Through my training and experience at various Checkpoints, I have learned that the utilization of cellular phones to communicate between coordinators, foot guides, load drivers, stash house operators, etc., is the most common form of communication. When examining cellular phones, you can uncover, among other things, evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text, email, other electronic messaging applications, and voice mail communications between the person who possessed or used the device and others. It is quite common for navigational coordinates to also be transmitted to and/or from these devices to determine the user's location through a GPS application to allow for tracking of aliens and/or confirm current location. In many areas of the border, scouts use phones to guide the groups to the pickup locations. This allows the guides to maintain a safe distance and isolate themselves from the group and thus evade apprehension. Sometimes these guides are in Mexico, other times in the United States. Drivers of scout vehicles are able to relay information to the driver of the load vehicle either with a direct call or with cellular programs called applications ("app") such as WhatsApp, with its "End-to-End Encryption"

which provides added a security feature that is very difficult to break, allows a cellular phone to function like a walkie talkie.  Through this app, scouts will relay information such as the presence of Border Patrol or other Law Enforcement Officials.  Drivers can also be guided by "pin drops" on apps such as Google Maps which will contain directions for the load vehicle.  ASOs (Alien Smuggling Organizations) will utilize several different apps and functions on their phones to facilitate the coordination of a smuggling event, all the way from inception of the Undocumented Non-Citizen to delivery of the Undocumented Non-Citizen at the desired location in the United States.  There is no set app but the one preferred has continually been WhatsApp.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

4.     The property to be searched consists of two (2) cellular phones. The cellular phones to be examined are a Motorola cellular phone (red in color). The second cellular phone is a Huawei cellular phone (blue in color).  These two (2) phones are collectively referred to as the **Target Phones**. The **Target Phones** are secured inside the Nogales Border Patrol Station Seized Property vault in Nogales, Arizona. The **Target Phones** are sealed in a Department of Homeland Security evidence bag with a signed Form 6051S Custody Receipt for Seized Property and Evidence.

5.     The requested warrant would authorize the forensic examination of the **Target Phones** for the purpose of identifying electronically stored data to include: any telephone numbers, including but not limited to numbers called, numbers stored for speed dial, pager numbers, names and addresses, electronically stored voice and text messages, calling card numbers, text messages, photos, videos and/or identifying information that may be stored

in the memory of the Target Phones, for items described in Attachment A (incorporated herein by reference).

## PROBABLE CAUSE

6. On December 7th, 2021, at approximately 12:44 A.M., a United States Border Patrol Agent Vergara (USBP) was assigned primary inspection duties at the Interstate-19 (I-19) Border Patrol Checkpoint, kilometer post 42, near Amado, Arizona.

7. At approximately 12:44 a.m., a green metallic colored Toyota 4Runner arrived at the primary inspection area. Agent Vergara observed a driver and front seat passenger inside the vehicle. Both the driver and front-seat passenger had silver chains around their necks and tattoos on their arms and face. The driver and the passenger stated they were United States Citizens. Agent Vergara noticed that the driver avoided eye contact with him and kept his hands firmly gripping the steering wheel. Agent Vergara shined his flashlight through the rear window and noticed piles of trash along with camouflage clothing. Agent Vergara asked the driver to roll down the rear passenger window, but the driver did not comply with this request. The 4Runner was referred to the secondary inspection area.

8. As the 4Runner moved forward and appeared to be pulling over into the secondary inspection area, it continued going North on I-19 at a high rate of speed. USPB agents at the primary inspection area notified other Border Patrol Agents via service radio that the 4Runner was fleeing the checkpoint.

9. A USBP vehicle left from the checkpoint in pursuit of the 4Runner. Agents were able to maintain visual of the taillights of the 4Runner and observed it exit the interstate at the Arivaca exit kilometer post 48. As the USBP agents were exiting the interstate, agents saw

the 4Runner run the stop sign and attempt to get on the on ramp to Interstate 19. The driver appeared to overcorrect and drove east off road and hit a small ditch and went airborne. The 4Runner continued driving and crashed through a barb wire fence and stopped.

10.     The pursuing USBP agents observed numerous individuals exit the vehicle through the passenger side. USBP agents ordered the individuals to stop. The individuals did not comply and continued to run and try to abscond. Agents checked the area around the 4Runner and found three individuals laying down in the tall weeds. These individuals were questioned as to their citizenship, and all stated they were citizens of Mexico. All were determined to be in the United States illegally.

11.     At approximately 12:50 a.m., a USBP detection canine handler responded to the area to assist. The USBP detection handler deployed his detection canine and began an open-air sniff of the field to the east of the 4Runner. After a short sniff of the area, the detection canine alerted to a trained odor and began tracing it to the south of their location. At approximately 1:00 a.m., the detection canine was able to locate one individual, later identified as Eric J. Flores, a United States Citizen. Flores had tattoos on his arms and neck and matched the description of both the driver and front-seat passenger contacted by Agent Vergara.

12.     Flores was placed under arrest for Transportation of Illegal Aliens. Upon detention, Flores had two cellular phones, a Motorola cellular phone (red in color) and a Huawei cellular phone (blue in color); the **Target Phones**. Agents subsequently seized the **Target Phones** as it is believed that Flores used one or both cellular phone/devices to communicate with an Alien Smuggling Organization (ASO) in order to coordinate the smuggling of the Undocumented Non-Citizens that ran away from the 4Runner at the time of the arrest.

13. After Flores was arrested, he was interviewed by Agent Vergara. Agent Vergara was able to confirm Flores matched the general description of both the driver and front-seat passenger of the 4Runner but could not definitively state which one Flores was. During the interview Flores stated he was the front-seat passenger and that the driver was a friend he knew as "AZ." Flores claimed he took an expensive Uber ride to Nogales for his niece's 15th birthday party, but did not have money for return trip nor could he ask his girlfriend to come get him as they were fighting. He remembered that "AZ," who he had done prison time with, lived down the block from him, so he called "AZ" to request a ride. Flores said he called "AZ," who told Flores he too was in Nogales and would give him a ride. Flores claimed when "AZ" picked him up there was no-one else in the vehicle and he did not see anyone else in the car when he put his luggage in the back. Flores stated when "AZ" got to the Border Patrol checkpoint he took off. Flores said he asked "AZ" what was going on, which is when "AZ" told him there were illegals in the car.

14. Flores became agitated when questioned how he could not have noticed the people hiding in the back of the car, which is where he put his luggage. Flores stated it was dark out and he was not going to ask any questions about what was in the car. Flores was asked for consent to search his phone so agents could confirm his story or help identify "AZ." Flores would not give consent and told agents he had an expensive lawyer and would sue anyone who put charges on him. He stated "AZ" was responsible for everything and that he would only tell agents where "AZ" lived if agents agreed to drop charges.

15. During an interview with one of the illegal aliens apprehended near the crash site, the alien stated after crossing the border he was guided to the pick-up point by cell phone

communications.

16. Based on the fact that Flores had Undocumented Non-Citizens concealed in the 4Runner, it is believed that Flores communicated with known and/or unknown person within the ASO to obtain knowledge of when the Undocumented Non-Citizens crossed the US/Mexico International Border Fence and subsequently when and where they were to be picked up. Further, Flores told USBP agents he had called "AZ," the person Flores identified as the driver of the 4Runner. Review of the **Target Phones** will confirm the veracity of this statement and help identify "AZ" and/or establish his phone number, which would assist agents in identifying him. Communications devices such as cellular phones allow ASO members to communicate with each other, load vehicle drivers, scouts and illegal aliens in order to coordinate precise actions within the alien smuggling event. Cellular devices allow persons to conduct surveillance on law enforcement while alerting the conspiring parties to continue their criminal acts without notice by patrolling law enforcement. ASO members routinely utilize cellular devices to communicate with load vehicles that are smuggling Undocumented Non-Citizens with the intent of transporting them further into the United States. The load vehicles are provided precise times, locations and instructions via cellular devices as their windows opportunity to load Undocumented Non-Citizens into their vehicles are very narrow on the US/Mexico border due to the high presence of law enforcement.

17. Based on all these facts, I believe that the **Target Phones** seized during the arrest of Flores were used to communicate with "AZ," and with other ASO members known and unknown to facilitate the crime of transporting Undocumented Non-Citizens in the United

States.

18. Since the date of the arrest, the **Target Phones** have been held in evidence with the USBP. The **Target Phones** have been stored in such a manner that their contents, to the best of my knowledge, are in substantially the same state as when it first came into possession of the USBP.

## TECHNICAL TERMS

19. Wireless telephone: A wireless telephone (or mobile telephone or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

20. Digital camera: A digital camera is a camera that records pictures and video as digital picture files, rather than by using photographic film. Digital cameras use a variety

of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos. Most cell phones currently manufactured contain digital cameras as a standard feature.

21. Portable media player. A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock or games. Most cell phones currently manufactured contain portable medial players as a standard feature.

22. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state. Most cell phones currently manufactured allow the use of the Internet as a standard feature. Further, most current cell

phones allow the user to transmit electronic messages via standard email services or specially designed communication applications between parties.

23. Based on my training, experience, research, and from consulting the manufacturer's advertisements and product technical specifications available online for these types of cellular phones, and based upon my discussions with experts, I know that the cellular phones which are the subject of this search warrant application most likely have capabilities that allow them to also serve as a radio communication transmitter, wireless telephone, GPS device, wireless internet connectivity, and text message capabilities, as these are generally standard features. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device; evidence of where such persons were when they possessed or used the device; evidence of who such persons were with when they possessed or used the device; evidence of persons with whom they communicated when they possessed or used the device; evidence of text, email, other electronic messaging applications and voice mail communications between the person who possessed or used the device and others. Navigational coordinates may also be transmitted to and/or from these devices to determine the user's location through a GPS application.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

24. Based on my knowledge, training and experience, I know that electronic devices such as the Target Phones in this case, can store information for long periods of time. Similarly, things that have been viewed via or uploaded to the Internet are typically

stored for some period of time on the device. Additionally, computer files or remnants of such files can be recovered even if they have been deleted. This is because when a person "deletes" the information on an electronic device, the data does not actually disappear, rather, the data remains on the storage medium until it is overwritten by new data. Information described in this affidavit can often be recovered by forensic computer experts using forensic tools and software.

25. As further described in this affidavit and Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Phones were used, where they were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on the Target Phones is more fully set forth in the factual section contained herein and because:

   A. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file, including frequency channels, text messages, video, or photographs.

   B. Forensic evidence on a device can also indicate who has used or controlled the devices. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   C. A person with appropriate familiarity of how an electronic device works may, after examining the forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

D. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E. Further, in finding evidence of how a device was used, the purpose of its use, who used it, when and where, sometimes it is necessary to establish that a particular thing is not present on a storage medium, for example, the absence of the entry of a name in a contact list as evidence that the user(s) of the Target Phones did not have a relationship with the party.

## CONCLUSION

26. Based on the foregoing information, there is probable cause to believe that Eric J. Flores has stored on the **Target Phones**, evidence related to the smuggling of Undocumented Non-Citizens within the United States. The examination of the **Target Phones** may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant. Because this warrant only seeks permission to examine devices already in the possession of the Border Patrol, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, there is reasonable cause for the Court to authorize

execution of the warrant at any time in the day or night. The aforementioned **Target Phones** have been properly stored at the Nogales Border Patrol Station Seized Property vault in Nogales, Arizona and is being transferred to the Tucson Sector Prosecutions Office. Due to the nature of such cell phones, data contained within will remain uncorrupted when being stored for an extended period of time. Therefore, I request that a warrant be issued, allowing for the search of the **Target Phones**, as described above.

*Argelia G Blair*

Argelia G. Blair, Border Patrol Agent

United States Border Patrol

Subscribed and sworn to before me

this __15th__ day of February, 2022:

*Lynnette C. Kimmins*

Honorable Lynnette C. Kimmins

United States Magistrate Judge

District of Arizona

22-05633MB

## ATTACHMENT A

## ITEMS TO BE SEARCHED

A Motorola cellular phone (red in color). The second cellular phone is a Huawei (blue in color), the "**Target Phones**." The **Target Phones** were seized from Eric J. Flores at the time of the arrest. The **Target Phones** are currently secured at Tucson Sector Prosecutions Unit at 2430 S. Swan Road; Tucson, AZ 85711. The **Target Phones** are sealed in a Department of Homeland Security Evidence Bag with a signed Form 6051S Custody Receipt for Seized Property and Evidence.

## ATTACHMENT B

## ITEMS TO BE SEIZED

1. Data and/or digital files stored on or accessed through the Target Phones (as described in Attachment A) relating to alien smuggling, wherever it may be stored or found, specifically including:

    a.   names of person(s) smuggled, pick up and drop off points for human smuggling, numbers of people to be smuggled, and dates/places where human smuggling took place;

    b.   information relating to payments for human smuggling, including: amounts of money obtained, received, exchanged, deposited, withdrawn, or delivered as well as dates, places, exchange rates, and amounts tendered for specific transactions;

    c.   any information related to sources of money funding human smuggling (including names, account numbers and/or payment account names (e.g. PayPal, Zelle, etc…) addresses, phone numbers, or any other identifying information));

    d.   all bank records, checks, credit card bills, account information, and other financial records that are related to human smuggling.

2. Electronic correspondence stored on or accessed through the Target Phones relating to alien smuggling, to include emails and attached files, text messages, instant messaging logs, and any electronic messaging used to identify pick up and drop off points (e.g. mapping applications such as Google Maps).

3. Information related to incoming calls, outgoing calls, missed calls, and duration of calls stored on or accessed through the Target Phones.

4. Contact lists stored on or accessed through the Target Phones, to include telephone and email contact names, telephone numbers, addresses, and email addresses.

5. Evidence of persons who used, owned, or controlled the Target Phones.

6. Logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, instant messaging logs, photographs, electronic correspondence, and telephone contact lists stored on or accessed through the Target Phones.